**DIOCESE OF ALTOONA–JOHNSTOWN**

v.

**ZONING HEARING BOARD OF the BOROUGH OF STATE COLLEGE, Donald Hopkins and Mildred Hopkins**

*Appeal of: Donald Hopkins and Mildred Hopkins.*

Commonwealth Court of Pennsylvania.

Argued April 6, 2006.

Decided May 19, 2006.

David D. Engle, State College, for appellants.

Shawn P. Sullivan, Altoona, for appellee, Diocese of Altoona–Johnstown.

BEFORE: PELLEGRINI, Judge, COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Donald and Mildred Hopkins (Neighbors) appeal from an order of the Court of Common Pleas of Centre County (trial court), which reversed the decision of the Zoning Hearing Board of the Borough of State College (ZHB) to deny the application of the Diocese of Altoona–Johnstown (Diocese) for a permit to construct a "Catholic Student Center" (Center), which will be a multi-use facility with a chapel, residences, and other student-use rooms. The Center is intended for use by Penn State students and proposed for construction within the Borough of State College's (Borough) R–2 District, which provides for the use of property as a "church or other place of religious worship" but not as a student center.

The Diocese owns three separate, but contiguous, lots in the College Heights Historical District, where it proposes to demolish the existing single-family homes and construct a two-story masonry structure, which is labeled on the concept plans as a "Catholic Student Center".

The layout of the Center, as provided on the Revised Concept Plan (Concept Plan) submitted to the Borough's Planning Department for preliminary approval pursuant to Section 305(b)(1) of the State College Zoning Ordinance (Ordinance), is as follows: In the basement, the plans call for a student storage room,[1] several study rooms, a game room, TV lounge, rest rooms, kitchen, laundry and mechanical rooms. (ZHB Ex. 9.) On the first floor, the plans call for a seventy-seat chapel (with altar, holy water font, clavanovia), a gathering room, reception areas, a great room, a living room, kitchen, pantry and storage rooms, a dining room and an attached three car garage with integrated lawn and maintenance storage area. (ZHB Ex. 9.) Neighbors concede that approximately fifty percent of the first floor will be devoted to the chapel. (Neighbors' Br. at 12–13.) On the second floor, the Concept Plan calls for three bedrooms with adjacent studies, two guest suites, a gathering area, bathrooms and storage

---

**1.** Father Matthew Laffey explained that the "student project storage area" would be used for the storage of banners, things for retreats, crosses, tapes of a symposium, etc. (Trans. at 135–36.)

area. The exterior is depicted as a two-story structure with peaks of varying elevations, and a steeple with cross. (ZHB Ex. 9.)

Unlike the university-provided space on campus that is shared with other denominations, the Center is designed to cater to the needs of Catholic students and will offer a Catholic library, Catholic publications, and the display of Catholic artifacts. (Trans. at 107–08.) The Center is envisioned as a place where Catholics can discuss and practice their faith, in addition to providing an area for social gatherings and other Catholic functions.[2] (Trans. at 109.) Sunday mass is currently, and will continue to be, held at Penn State's Pasquerilla Center, which is big enough to hold the 1500 to 1800 students who normally attend Sunday mass on any given weekend; however, the new Center will offer daily mass for an estimated 23 students in its 70 seat chapel. (Trans. at 115.) The Center will also provide housing for three Benedictine monks—a residence area intended solely for the three priests and their guests. The ZHB characterized the Center as consisting of "a 70 person chapel in the west wing, a two story residence for three Benedictine monks in the right wing, and rooms for instruction, confession, storage and social functions in that part of the building that connects the two wings." (ZHB Decision at 16.)

The Borough's Planning/Zoning Officer approved the Concept Plan for the Center on October 18, 2004. In a letter to concerned neighbors mailed three weeks prior to his approval, the Zoning Officer explained that the proposed uses of the Center would "fall under the umbrella of churches and those things that are customarily associated with churches and places of religious instruction." (Letter from Herman L. Slaybaugh, Planning/Zoning Officer, to Yvonne and Robert Hunter (Sept. 27, 2004) (ZHB Ex. 7).) He countered the assertion that the chapel within the Center could not be considered the primary use of the Center because of the comparatively small space allocated for it, by noting that a principal use does not necessarily turn on space allocation. The Zoning Officer analyzed the Concept Plan as providing "that the primary function of the building is religious in nature and that the other spaces in the building including the residence are in support of the religious function." *Id.* He believed the functionality of the Center was "religious in nature akin to a church" and that the residential component, TV lounge, game room, etc., were "incidental to and logically connected with the principal use...." *Id.*

Neighbors appealed the approval of the Concept Plan to the ZHB, which ultimately concluded: that the primary use of the facility is that of a student center/multi-family residence, and not as a church or place of worship; that the facility will be devoted primarily to secular uses as a student center/meeting place and not to religious uses; and that the Center is not in keeping with the character of the neighborhood and will not promote area homogeneity. (ZHB Decision Conclusions of Law ¶¶ 6–8.) In reaching these conclusions, the ZHB found "most persuasive" the arguments concerning the relative amount of the Center's floor area to be devoted to the chapel and reasoned that the great disparity in area devoted to the chapel as opposed to the remainder of the facility reveals its true primary use—a multi-family residence and a student center. The ZHB relied upon *Appeal of Russian Orthodox Church of the Holy Ghost, of Ambridge,* 397 Pa. 126, 152 A.2d 489

---

2. Penn State's Newman Club, which, on a good night, is attended by 50 students, will meet at the Center each Monday evening. (Trans. at 115, 170.)

(1959) (reasoning that the operation of a cemetery owned by a Russian Orthodox Church was not a religious use of the land) and *Camp Ramah in the Poconos, Inc. v. Zoning Hearing Bd. of Worcester Twp.*, 743 A.2d 1019 (Pa.Cmwlth.2000) (reasoning that a camp operated by a Jewish organization was a recreational use and not a religious use), for the proposition that operation of a secular use of property (as a place for students to meet) by a religious organization does not transform that ordinarily secular use into a religious use (a church). (ZHB Decision at 21–22.)

The Diocese appealed the ZHB's adjudication to the trial court, which, without taking additional evidence, reversed and ordered the issuance of a building permit as approved by the Zoning Officer. The trial court reasoned that the Center was a "church," which is permitted as of right within the R–2 District, and that the ZHB erred in focusing on a numerical comparison of the floor area ratio between the chapel and the Center's other uses in determining that the primary use of the Center was not a "church." The trial court stated that it "believes a 'church' is defined by the expectations of the people at the building, and the soul of those present. . . . [A] building dedicated to religion is a church." (Trial Ct. Op. at 5–6.) The trial court further stated that it "is convinced the testimony of Father Matthew Laffey demonstrates that the Catholic church believes its mission, in reaching out to impressionable youths in our community, involves the entire process of emersion in the vestments and traditions of the Catholic faith, and is not limited in any way to the use of the chapel itself." (Trial Ct. Op. at 6.) Finally, the trial court stated that its review of the record did not substantiate that the Center will have any deleterious or detrimental effects on the surrounding neighborhood. (Trial Ct. Op. at 8.) Neigh-

bors appealed the trial court decision to this Court.

On appeal to this Court, Neighbors argue that: (1) the trial court erred by reversing the ZHB's determination that the primary use of the proposed Center is a student center rather than a "church or other place of religious worship"; (2) the trial court erred by not finding that the uses of the non-chapel portions of the proposed Center are not permitted under the Borough Ordinance as accessory uses; and (3) the trial court erred by reversing the ZHB's determination that the proposed Center is not permitted in the Borough's R–2 District because it disrupts the homogeneity of the historic district.

■■■ Where, as here, the trial court does not take additional evidence, our scope of review is limited to a determination of whether the ZHB has manifestly abused its discretion or committed an error of law. *Warner Jenkinson Co., Inc. v. Zoning Hearing Bd. of the Twp. of Robeson*, 863 A.2d 139, 142 n. 5 (Pa.Cmwlth. 2004). "Whether a proposed use, as factually described in an application or in testimony, falls within a given category specified in an ordinance is a question of law." *Southco, Inc. and Contact II, Inc. v. Concord Twp.*, 552 Pa. 66, 71, 713 A.2d 607, 609 (1998). Courts confronted with interpreting ambiguous or undefined terms within an ordinance are guided to: construe words and phrases in a sensible manner; utilize the rules of grammar and apply their common and approved usage; give undefined terms their plain, ordinary meaning; and resolve any doubt as to the application of an ambiguous term in favor of the landowner and the least restrictive use of the land. *Steeley v. Richland Twp.*, 875 A.2d 409, 414 (Pa.Cmwlth.2005)

We begin with a review of the relevant portions of the Borough's Ordinance. Sec-

tion 501(b) of the Ordinance allows for, as of right within the R–2 District:

> **Church or other place of religious worship** including *accessory religious instruction* and *religious school* as an accessory use when located on the same lot as the place of religious worship, provided that the lot has frontage on and primary vehicular access from an arterial street and meets parking as required in Section 2403.c.

(Bold-face emphasis added.) The terms "religious instruction" and "religious school" were inserted by a 2004 amendment and are defined as:

> *Religious Instruction.* An accessory use referring to the teaching of religious information or topics when offered on the same premises as a church, mosque, synagogue, or other place of religious worship and conducted by the religious entity itself.

> *Religious School.* Any school offering instruction in religious based education and operated by, or under the authority of, a bona fide nonprofit religious institution certified by the Department of Education of the Commonwealth of Pennsylvania.

(Ordinance § 201 (citations omitted).)[3] The Ordinance defines "Use (Accessory)" as: "A secondary use customarily incidental to and clearly subordinate to the primary use of the lot or its structures and located on the same lot as the primary use, unless specifically permitted elsewhere by these regulations."[4] (Ordinance § 201.)

■ Neighbors first argue that the trial court erred by reversing the ZHB's determination that the primary use of the Center is that of an impermissible student center.[5] Neighbors believe this error derives from the trial court's failure to apply the appropriate deferential review and, instead, impermissibly substituting its judgment for that of the ZHB. They assert that the ZHB's decision is supported by substantial evidence of record and took into consideration both qualitative and quantitative factors in reaching its conclusion that the Center's primary use was a student center and multi-family residence. While conceding that a Catholic student center could be "clearly subordinate" to the primary use of a structure, Neighbors argue that the facts here establish the opposite, that it is the chapel that is actually "clearly subordinate" to the student cen-

3. The ZHB found that "[t]he legislative intent of [the 2004 amendment was] to allow second party religious schools to operate at a church or place of religious worship...." (ZHB Finding of Fact ¶ 55.)

4. The R–2 District allows, by special exception, the "[c]onversion of existing fraternity houses" to: (a) *Club or Community Center.* (Ordinance § 601(d)(1) (emphasis added).) A "Club" is defined as "[t]he non-profit use of land and structures for social activities among members and their guests." (Ordinance § 201.) A "Community Center" *is defined as* "[t]he nonprofit use of land and structures *for social and community service activities,* including recreational programs, professional counseling services, and/or human services agencies and programs, provided that the sale of intoxicating beverages on the premises be prohibited." (Ordinance § 201 (emphasis added).) While the evidence of record *does* not support a finding that any of the three homes owned by the Diocese is or was a fraternity house, we note the fact that a "Club" and "Community Center" is permitted *within the R–2 District by special exception,* which is "[a]n allowance in zoning for special uses that are considered essential and are not fundamentally incompatible with the original zoning regulations," Black's Law Dictionary 1403 (7th ed.1999), and that the non-chapel uses complained of by the Neighbors, arguably, would fall within those definitions.

5. The Ordinance does not define "student center."

ter.[6]

From our review of the record, we agree with the trial court that the ZHB erred by finding that the primary use of the Center would be as a student center/multi-family residence, and not as a church or place of worship.

Neighbors argue that the ZHB correctly applied Pennsylvania law, emphasizing dimensional considerations in its primary verses accessory use analysis. *Southco*, 552 Pa. 66, 713 A.2d 607 (reasoning that the proposed turf club was a restaurant use and the wagering aspects would be "secondary" to the restaurant); *Franchi v. Zoning Hearing Bd. of Borough of New Brighton*, 117 Pa.Cmwlth. 236, 543 A.2d 239 (1988) (reasoning that maintenance of a one room efficiency apartment on the second floor of a duplex otherwise used as an accounting office amounted to the primary use of the property as an office, not a residence with a home occupation). Reading *Southco* and *Franchi* together with the Borough's definition of "accessory use" and "primary use," Neighbors argue that the ZHB correctly found that the primary use of the Center is an impermissible student center because the dimensional ratio between the chapel and the rest of the Center is 22%. We disagree with that analysis.

We find nothing in *Southco* or *Franchi* to suggest that a primary use must constitute any particular percentage of a structure's floor-area ratio or that the area devoted to primary, as opposed to accessory, uses is a "key consideration"; rather, such a comparison is only a relevant factor, but not a controlling factor, to any primary use inquiry. In *Southco*, our Supreme Court held the applicant's proposed Turf Club was a permitted restaurant use by right because, as required by the ordinance's definition of "restaurant," it "would devote a significant amount of space, manpower and money towards the sale and consumption of food and beverages." *Southco*, 552 Pa. at 73, 713 A.2d at 610. This holding was premised on the Turf Club utilizing 75% of the building for the sale and consumption of food and beverage; having the capacity for private parties and banquets; and, utilizing the majority of the proposed employees for the sale of food and beverages. *Id.* 552 Pa. at 72–73, 713 A.2d at 610. In *Franchi*, this Court held that a one-room efficiency apartment, located on the second floor on one side of a duplex used as an accounting office, was not the primary use of that duplex, because the accounting office occupied all of the first floor and the landowner only moved into the efficiency apartment after separating from his ex-wife. We, moreover, did not engage in any numerical comparison of percentage of the duplex utilized as an office or residence. Rather, our holding in *Franchi* was premised on a consideration of the circumstances leading to the property owner setting up the efficiency apartment and that the accounting office was "clearly" the predominate use of

6. Neighbors further assert that the trial court's definition and understanding of the word "church" is so broad as to allow the Diocese to deem any building it desires to be a church simply by saying that it is. They also note that the Concept Plan is, in fact, labeled "Catholic Student Center", and not "church" or "chapel," and that the Center is not a "community church" that would be open to the entire community. They also argue that the Center does not conform with the written definition of "church" as provided in the United States Conference of Catholic Bishops' website; that the Center does not meet the dictionary definition of "church"; and, that the Center does not meet our Supreme Court's understanding of the meaning of "church." They believe the trial court incorrectly reasoned that you can lump multiple and distinct uses of the Center into one vague amorphous "church" or "ecclesiastical" use.

the property. *Franchi*, 543 A.2d at 240–41. Thus, neither *Southco* nor *Franchi* stand for the proposition that a primary use must constitute any percent of a structure or that the area devoted to primary verses accessory use is a "key consideration." [7]

We agree with the trial court, and the Zoning Officer, that the primary use of the Center is that of a "[c]hurch or other place of religious worship." As explained by Father Matthew Laffey, the Director of Catholic Campus Ministry at Penn State, the Center will be used for the administration of Catholic sacraments, sacramentals, "[a]dorations, stations of the cross, morning and evening prayer, [and] various other devotions." (Trans. at 108.) Father Laffey further explained that the university provided area fails to offer students the ready access to the Catholic Church's sacraments and sacramentals, which he testified are vital to the Catholic faith. (Trans. at 108.) The area outside of the Chapel, the common space of the proposed Center, was explained as providing space for the administration of the sacrament of reconciliation and an area for the discussion of scripture and the affect of God in the lives of students. (Trans. at 109.) We also find persuasive the testimony of Larry Sutton, who is the Diocese secretary for temporalities, wherein he explained that he anticipated the Bishop would consecrate the "worship space" of the Center, just as the Bishop would for other new churches. (Trans. at 211–12.) Furthermore, we agree with the Diocese [8] that the Concept Plan for the Center demonstrates that the entire first floor of the Center is typical of a Catholic Church, which, combined with the exterior design of the Center, substantiates that the Center fits within the Ordinance's allowance for a principal use of property as a "[c]hurch or other place of religious worship." [9] Moreover, Section 501(b), through the inclusion of the language "other place of religious worship" with "accessory religious instruction," seems to specifically allow for non-traditional church buildings, like the Center, where congregants can practice, learn and share their faith.

We further find this Court's decision in *Benedictine Sisters of Pittsburgh v. Fayette County Bd. of Assessment Appeals*,

7. The Diocese believes the ZHB decision was in error because it set a new standard by "proclaiming that, because the chapel, which is the site of actual religious worship, is below a certain proportion of the building as a whole, then the accessory uses, even if religiously focused, do not count towards the overall use of the building." (Diocese Br. at 5.)

8. The Diocese believes that the ZHB erred when it did not apply our Supreme Court's understanding of the word church in *Appeal of Upper St. Clair Township Grange No.2032*, which reasoned:

Black's Law Dictionary defines the word as 'an organization for religious purposes or for the public worship of God.' The ordinary meaning of the term contemplates a place or edifice consecrated to religious worship, where people join together in some form of public worship. The courts of this state have similarly interpreted the word 'church' when it has been employed in other statutes.

397 Pa. 67, 73, 397 Pa. 67, 152 A.2d 768, 771 (1959).

9. Larry Sutton, who is the secretary for temporalities for the Diocese, explained the origin of the title "Catholic Student Center":

We wanted to use Catholic, because we wanted to identify it as a Catholic facility, but we put student in there, because we did not want this to be viewed as a parish where just anyone feels like that's another choice for Sunday Mass. . . . We wanted to have the public recognition that we're trying to cater to Catholic students. . . . [O]ur whole focus to begin with was on Catholic. It's a Catholic center, not a student center. . . . .

(Trans. at 208–09.)

844 A.2d 86 (Pa.Cmwlth.2004), *pet. for allowance of appeal denied,* —— Pa. ——, 898 A.2d. 1073 (No. 185 WAL 2004, filed April 25, 2006) to be instructive and supportive of our holding here. In *Benedictine Sisters,* we ruled that a three bedroom, ranch style house with a swimming pool and detached garage used for retreats was exempt from taxes as an "actual place[] of regularly stated religious worship," as provided by the Pennsylvania Constitution, Article VIII, Section 2(a)(i).[10] We reasoned that "the fact that some education may be taking place at the property does not mean that education is the primary use of the property" and that "the concept of worship is not limited to a formal service." 844 A.2d at 90 (citing *Mount Zion New Life Center v. Bd. of Assessment and Revision of Taxes and Appeals,* 94 Pa.Cmwlth. 439, 503 A.2d 1065 (1986) and *Evangel Baptist Church v. Mifflin County Bd. of Assessment Appeals,* 815 A.2d 1174 (Pa.Cmwlth.2003)). Looking to the stated use of the property for "prayer, spiritual readings and discussions," we concluded that the "Benedictine Sisters satisfied their burden of showing that the Property's primary purpose is as a place of regularly stated worship." *Benedictine Sisters,* 844 A.2d at 90. Here, just as we interpreted "actual place[] of regularly stated religious worship" to include a retreat house in *Benedictine Sisters,* we interpret "church or ***other place of religious worship***" to include the Center.

▇ Next, Neighbors argue that if the chapel is considered the primary use of the Center, then the trial court's analysis is faulty because it failed to address whether the non-chapel uses of the Center (the student center and residential uses) were permissible as an accessory use. They assert that the proposed student center and multi-family residence do not comprise a permissible accessory use of "religious instruction" or "religious school." Applying *Russian Orthodox* and *Camp Ramah,* Neighbors argue that the operation of the normally secular student center and residence by the Catholic Church does not transform those uses into either "religious instruction" or a "religious school."

The Diocese essentially asserts that non-chapel uses of the Center do constitute "religious instruction" because the Center is designed as a place where "all the attributes of the Catholic religion [can] be expressed and Catholic students [can] have a place to practice their faith, to worship and praise God." (Diocese Br. at 4 (citing Trans. at 106).) It also notes that the Center will be utilized for the study of scripture in the Catholic tradition, as a gathering place for Catholic organizations like: the Newman Club, Right of Christian Initiation for Adults, Students for Life, Right of Life Charismatic prayer group, Men Seeking God group, Women Seeking God group, Mission Mexico, Project Haiti, and a Catholic Group called SNACK. (Diocese Br. at 4; Trans. at 109–112.) The Diocese states that the purpose of the Center is to give the Catholic Penn State students a church setting where even the secular activities "conducted will be experienced in a Catholic environment." (Diocese Br. at 8.) The Diocese argues that all of the uses described before the ZHB are consistent with the functioning of a Catholic Church and there could be no clearer case of "religious purpose" than what was presented before the ZHB. The Diocese

---

10. Article VIII, Section 2(a)(i) of the Pennsylvania Constitution provides:

> (a) The General Assembly may by law exempt from taxation:

> (i) Actual places of regularly stated religious worship;

> . . . .

Pa. Const. Art. 8, 2(a)(i)

believes that it has established the building as an "ecclesiastical" building offering "religious instruction." (Diocese Br. at 3–4.)

We agree that the evidence of record, in particular the testimony of Father Laffey (*see generally* Trans. at 108–116), substantiates that the non-chapel uses of the Center are allowed as accessory uses of "religious instruction" to its primary use as a church or other place of religious worship. Moreover, we note that Neighbors conceded in their brief to this Court that a student center could be considered a permitted accessory use to a church. (Neighbors' Br. at 12.) While some of the non-chapel uses may be a-typical secular uses (like the study rooms and kitchen), those individual uses, as utilized by the Diocese within the planned Center, will be associated with the ecclesiastical purpose of the Center, which originates from its primary use as a chapel. Even the residences are for the purpose of housing monks, who will be conducting daily mass, administering sacramentals, and generally serving the religious development of the students, thus a component of a "religious instruction."[11] Furthermore, the Diocese is not attempting to convert an impermissible secular use into a permissible religious use, as in *Russian Orthodox* and *Camp Ramah*, through its operation by a religious denomination. All of the Center's uses, both chapel and non-chapel, are tied to providing a "religious home" for Catholics. Sister Mary Parks, *A place Catholic community can call 'home'*, Centre Daily Times (Jan. 4, 2005) (ZHB Ex. P–4). Accordingly, the non-chapel uses of the Center are allowed as accessory to the chapel, especially in light of the fact that Section 501(b) specifically allows for accessory reli-

gious instruction within a church or place of religious worship. The Center's primary use is that of a permissible church, with non-chapel uses permitted as accessory uses to the church.

Neighbors also argue that the ZHB's decision correctly preserved the integrity of the Ordinance and the principle of area homogeneity espoused in *Russian Orthodox* (reasoning that area homogeneity is one of the important purposes of a zoning ordinance). Neighbors look to the Borough's Community Development Goals, which include maintaining "[t]he high quality of existing housing" and preserving "[t]he character of older, sound residential neighborhoods...." (Ordinance § 110.a.) They also assert that the trial court erred by not addressing Section 110.a or the principle of area homogeneity espoused in *Russian Orthodox*. We disagree.

In contrast to the Neighbor's contention that the trial court did not address the issue of the Center's conformity to area homogeneity, we note, and agree with, the trial court's statement that, "there is no indication that the proposed structure will be an architectural eye sore and detract from the character of the neighborhood." (Trial Ct. Op. at 8.) We further agree with the trial court's assertion that, "[s]imply because some residents do not like the appearance of a building in their neighborhood[, that dislike] is not a legal reason to prevent a party from commencing" construction. (Trial Ct. Op. at 8.)

Therefore, consistent with the above reasoning, we affirm the trial court's order.

---

**11.** In response to a question as to who would stay in the two guest suites on the second floor of the Center, Father Laffey responded:

 Well, we have three guest suites where I live now. The Abbot comes usually once a semester.... Family. My mother can come stay there.... Students do not stay there.

(Trans. at 141.)

## ORDER

**NOW,** May 19, 2006, the order of Court of Common Pleas of Centre County is hereby affirmed.